```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
                         SOUTHERN DIVISION
```



```
STACY FREELAND,              }

       Plaintiff,            }
                             }       CIVIL ACTION NO.
v.                           }       03-AR-3409-S
                             }
SOUTHERN NUCLEAR OPERATING   }
COMPANY,                     }
                             }
       Defendant.            }
```

## MEMORANDUM OPINION

Before the court is the motion of defendant, Southern
Nuclear Operating Company ("Southern Nuclear"), for summary
judgment. Plaintiff, Stacy Freeland ("Freeland") claims gender
discrimination under Title VII, as well as discrimination under
the Americans With Disabilities Act ("ADA"). These are
alternative or redundant theories. The court can detect no intent
by Freeland to place herself in a discrete protected group of
females with a disability. Also before the court is Southern
Nuclear's motion to strike references to and evidence regarding
Freeland's ultimate termination that took place after this suit
was filed.

### Summary Judgment Facts

Southern Nuclear hired Freeland on December 9, 1999 as a
nuclear specialist. A nuclear specialist's duties include both
field and office work, the field work consisting mostly of

<div style="text-align:center">1</div>



inspecting electrical equipment at nuclear plants with an infrared camera. The cameras are used to detect excessive heat which could pose a risk of injury or death. Nuclear specialists must have free and unescorted access to nuclear plants. Freeland was given such access.

In order to ensure public safety, the Nuclear Regulatory Council ("NRC") requires nuclear licensees like Southern Nuclear to adhere to certain personnel regulations. NRC regulations include fitness for duty requirements, 10 C.F.R. § 26.10, and personnel access requirements, 10 C.F.R. § 73.56. Nuclear licensees must implement written fitness for duty programs that ensure that employees "perform their tasks... not under the influence of substance, legal or illegal, ... or physically impaired from any cause, which in any way affects their ability to safely and competently perform their duties." 10 C.F.R. § 26.10. NRC further requires that licensees maintain authorization programs so that "individuals who are granted unescorted access are trustworthy and reliable, and do not constitute an unreasonable risk to the health and safety of the public including a potential to commit radiological sabotage." 10 C.F.R. § 73.56. Licensees are compelled to observe the behavior of personnel with unescorted access, and to detect changes that are or may be detrimental to public safety. NRC regulations require that decisions to grant or deny unescorted access be based on all

2

relevant available information.

In response to the NRC regulations, Southern Nuclear adopted policies and guidelines to ensure fitness for duty, as well as keeping up to date on relevant information for determining unescorted access authorization. Southern Nuclear's policy requires that all employees report any custodial arrest to their immediate supervisor no later than the first day after arrest. After any custodial arrest involving alcohol or drugs, the employee is required to undergo a mandatory fitness for duty evaluation by an independent expert. If necessary, investigation, evaluation and recommendations are made with regard to the employee's unescorted access status. Nuclear employees reporting an alcohol related arrest will be referred to the Employee Assistance Program and must submit to a drug and alcohol screen. This also applies where substance abuse (including alcohol) is a significant contributing factor in the arrest. After the fitness for duty evaluation by the independent expert, the Southern Nuclear Medical Director makes her appraisal of the expert's recommendations. If the recommendations of the independent experts are approved, the Medical Review Officer for Southern Nuclear and the employee make a "contract" to comply with the treatment recommendations and spell out the consequences of non-compliance. Compliance with the contract is monitored and reported to management and failure to comply may involve

3

disciplinary action up to termination.[1]

On January 1, 2003, Freeland was arrested for third-degree assault by Homewood Police. Freeland promptly informed her direct supervisor of the arrest, as company policy required. In a subsequent interview with corporate security, Freeland reported that she had five glasses of champagne prior to midnight at a New Year's Party. She remembered little else about the evening. Homewood Police told her that her blood alcohol level was 0.23% at the time of her arrest. Freeland's friends told her that she fought with a friend of her's over the car keys. Freeland was "uncontrollable," and the police were summoned to break up the altercation. Freeland was placed on paid administrative leave and referred for a mandatory fitness for duty evaluation.

Freeland was next referred to Value Options. Value Options is a third party, independent expert providing employees assistance programs, management of substance abuse and mental health plans, as well as fitness for duty evaluations. On January 21, 2003, two evaluations of Freeland were scheduled by Value Options, one by Dr. Sanjay Singh, a psychiatrist, and one by Dr. James Collier, a psychologist. Their evaluations and

---

[1]This is a summary of Southern Nuclear's chosen portions of the procedures. The most relevant procedures by which Southern Nuclear complies with its duties under the NRC regulations are restated here in a very cursory fashion for the sake of brevity. The exact quotations are available in Southern Nuclear's brief. This court does not question either the necessity, in light of NRC regulations, or the wisdom of Southern Nuclear's particular fitness for duty policies.

recommendations of Freeland were reported to Value Options. These reports were reviewed by Dr. Michael Lancaster, a psychiatrist and the Regional Medical Director for Value Options. Through Value Options, Dr. Lancaster recommended to Southern Nuclear that Ms. Freeland be further treated and evaluated at Bradford's Intensive Outpatient Treatment Program. Lancaster further recommended that Freeland continue to see counselor Leeann Brakke, whom she had been seeing since long before her arrest. It further recommended that Ms. Freeland was trustworthy and reliable and able to return to work, as long as she remained abstinent from alcohol.[2] Freeland was not, and has not been, diagnosed by anyone as having a substance abuse problem, or alcoholism. Freeland denies she is an alcoholic as well.

Dr. Calvert Dodson was Southern Nuclear's Medical Director, and he reviewed the recommendations of Value Options. Before Freeland was allowed to return to work, she was required to agree to a Fitness for Duty Contract ("FFD contract"), in accordance with Southern Nuclear's compliance plan. The FFD contract was presented to Freeland, including the recommendations of Value Options listed above. Freeland refused to sign the contract because she did not think that she should have to abstain from

---

[2]Dr. Lancaster gave several reasons for his determination that Freeland should abstain from drinking. First, he cited the necessity of safety in the highly regulated nuclear industry. Second, he pointed out that Freeland had had at least one other arrest related to alcohol in Houston, Texas within "a brief period of time." Third, Freeland was on other medications that it would not be "responsible" to take while drinking.

drinking alcohol for the duration of her employment. Dr. Dodson informed her that the doctors at Value Options thought they needed a period of time to determine if she had real substance abuse problems. After claiming to be "under duress," Freeland was told that they would take a break and come back to it. Freeland ultimately signed the FFD contract on February 6, 2003. Freeland claims now that she understood that she would be fired if she did not sign the contract.

In March 2003, Freeland completed her outpatient treatment at Bradford. At that time, Value Options renewed its recommendations that Freeland remain abstinent from alcohol, and remain in the frequent testing pool. Bradford further recommended that Freeland remain in weekly aftercare programs and attend AA meetings. A new FFD contract was subsequently presented to Freeland, and she signed it on March 27, 2003.

On May 23, 2003, Freeland sent a memo to Billie Rooks ("Rooks") asking for a reevaluation of her FFD contract on the grounds that her aftercare and AA was "creating undue hardship" on her personal life. After that, Freeland was reevaluated by Dr. Steven Bair. Dr Bair found that Freeland's drug screens had all been normal, and that she did not have a current problem with alcohol. Dr. Bair believed that Freeland had "maximized" her benefits of her aftercare and AA meetings, and her attendance should no longer be required. He did recommend that Freeland

6

continue to maintain abstinence from alcohol, in light of her
history of alcohol related incidents. Dr. Bair recommended that
Freeland attend two to three sessions with her personal
counselor, Brakke, in the subsequent two weeks. In order to
facilitate those meetings, Freeland was restricted to office work
for the next three weeks.[3] She suffered no loss of job duties,
but rather was only asked to do office work she would normally do
when not in field.

After these recommendations, a new FFD contract was executed
on June 20, 2003. That contract no longer required attendance at
AA meetings, or at Bradford aftercare. The new FFD contract did
continue to require Freeland to maintain abstinence from alcohol,
and remain in frequent testing.

Freeland claims that her supervisors have referred to her as
having an alcohol problem, but Freeland does not recall them
specifically using the word "alcoholic." Specifically, she says
Alvin Harris told her that "his daughter had an alcohol problem
also." Freeland found that comment "very offensive."

Freeland received pay raises each year she was employed at
Southern Nuclear. She received a three percent raise in March
2004, and many other employees (including male, female and non-
disabled) received only a one percent increase. She received a

---

[3]Freeland admits that her own treating physician restricted her from
travel for work because of her stage of pregnancy.

$14,000 bonus in the year 2003.

On June 15, 2003, Freeland filed her EEOC charge alleging discrimination because of gender and under the Americans with Disabilities Act. Freeland was ultimately terminated by Southern Nuclear on May 12, 2004, but the termination is not the subject of this action.

## Analysis

### Motion to Strike

The motion to strike in this case is well-taken, and would be granted if the material would change the outcome. On June 18, 2004, this court specifically refused to allow Freeland leave to amend her complaint to include a charge relating to her termination. That order did not preclude Freeland from seeking relief in a separate cause of action. Freeland has filed a separate action relating to her termination.[4] Therefore, all portions of relying on her termination as part of the cause of action are due to be stricken. There may be some evidentiary value to the termination. It might be relevant and admissible in this case. However, ultimately, Southern Nuclear's motion is moot because the decision to grant or deny summary judgment does not turn on whether the evidence of termination is stricken.

### Gender Discrimination Claim

---

[4] This court allowed Freeland to file her termination claim in a separate action, and she did so. That case is currently pending as Civil Action No. 04-HGD-2485-S.

8

Establishing a *prima facie* case of gender discrimination requires showing at least that plaintiff, (1)is a member of a protected class; (2) suffered an adverse employment action, and; (3) was treated unfavorably when compared with a similarly situated male employee. *Williams v. Motorola, Inc.* 303 F.3d 1284, 1293 (11th Cir. 2002). It is undisputed that Freeland is a member of a protected class.

Freeland, however, cannot show that she suffered an adverse employment action. "Not every action that makes an employee unhappy is an actionable adverse employment action." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998). In her response to the motion for summary judgment, Freeland contends that the adverse action against her was her termination on May 12, 2004. This court refused to allow leave to amend her complaint to include Freeland's termination by its June 18, 2004 order. Rather than arguing that her referral to fitness for duty evaluation or some other action was in fact an adverse action, Freeland chose to rely exclusively on her termination as the adverse employment action. Having been specifically excluded in this case and the subject of a separate action, Freeland's termination cannot qualify as the adverse employment action in this case. It is perhaps theoretically possible that other actions taken by Southern Nuclear which qualify as adverse actions, but because they were not argued by Freeland, they are

9

not considered here. Probably, Freeland puts all of the eggs in the termination basket because it would be difficult, if not impossible, for her to point to anything else that would qualify as an adverse action.

Freeland ultimately fails to establish the third element of a *prima facie* case, as well. She has utterly failed to produce any evidence that she was treated less favorably than similarly situated male employees. Since no other evidence of gender discrimination is available, Freeland must point to  evidence showing that similarly situated men received favorable treatment compared to her. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Freeland points to two comparators who she claims received favorable treatment.  Originally, Freeland complained that she believed male employees of Southern Nuclear "have been arrested for driving under the influence and other substance abuse offenses... and have not been subjected to the same restrictions." However, there is no evidence to support Freeland's "belief." The deposition of Paul Bizjack expressly contradicts Freeland's assertion that male employees have not been subjected to the same discipline as was Freeland. In fact, Freeland admits that she cannot identify any actual male employees whom she believes were the beneficiaries of such alleged bias towards men.

Freeland's case, built entirely upon her unsubstantiated

10

belief, cannot create a "genuine issue" of fact. It seems very clear that Freeland's failure to present any corroboration of her "belief" indicates a lack of an actual issue of fact. Regardless, with absolutely no evidence presented to suggest that men are treated differently, Freeland cannot make out a *prima facie* case without demonstrating favorable treatment.[5]

Freeland also attempts to analogize her situation to that of a former co-worker, Mike Perry ("Perry"). Perry held the same job as Freeland, with the same responsibilities and risks attached. Perry struggled with attention deficit disorder ("ADD"), which could have caused critical errors through a lack of focus. Perry, unlike Freeland, was never subjected to a fitness for duty evaluation despite some repeated lapses in performance at work. Also, unlike Freeland, Perry was not arrested. For an employee to be a proper comparator, the conduct or situation of the employee must be almost identical in "quality or quantity." *Maniccia v. Brown* 171 F.3d 1364, 1368 (11th Cir. 1999). The use of Perry as a comparator is heavily flawed.  Freeland was automatically assessed for fitness for duty upon her custodial arrest involving alcohol. Southern Nuclear policies require such treatment.

---

[5]Likewise, Freeland's attempts to charge gender discrimination as evidenced by rumors and sexual innuendo involving her and a male co-worker ultimately fail. The rumors which include a male co-worker, indicate discrimination against both a male and a female based on perceived actions. Remember that sexual discrimination must be based in some way on gender, not on sexual conduct. The teasing of both Freeland and her male co-worker indicates that it could not have been based on *gender*.

11

Perry's illness may have affected his ability to perform his duties, but company policy did not require mandatory fitness for duty evaluation for ADD. There is no such automatic requirement with regard to ADD. There is virtually no comparison between the treatment of Perry and Freeland, because Perry was not arrested and suffered from an entirely different impairment.

Moreover, Perry's treatment is not even tied to the original complaint and EEOC charge. In the charge, Freeland claimed that other male employees were involved in custodial arrests involving substance abuse. The use of Perry does not fit this mold at all. Her argument, as best this court can tell, has morphed into an assertion that males with problems are given every chance to succeed, but she was not.[6] There is simply no logical inference which can be drawn from a comparison of Perry and Freeland. However, this is all not to mention that Perry was ultimately terminated– the exact adverse action Freeland complains of in her brief, but not cannot complain of in this case.

Freeland's mandatory referral to fitness for duty assessment for a custodial arrest is in line with stated company policy for all employees, male or female. Without proof that similarly situated men were treated differently with regard to this policy, Freeland cannot make out a *prima facie* case. The comparisons made

[6]Freeland's termination is not part of this claim, and, while it may be used as evidence of discrimination, it cannot form the basis of the *prima facie* case.

are so incongruous that they cannot support an inference of gender discrimination. Because Freeland cannot make out a *prima facie* case, there is no reason to proceed to the consideration of pretext or mixed motive analysis. There being no genuine issue of material fact, judgment as a matter of law on the gender discrimination claim is required.

### ADA Claim

Freeland alleges that Southern Nuclear also discriminated against her based on a perception that she was an alcoholic.[7] A *prima facie* case of discrimination for a perceived disability under the ADA requires the plaintiff to show 1) a perceived disability; 2) plaintiff was otherwise qualified to hold the job, and; 3)she was discriminated against because of the perceived disability. *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). A person is "regarded as" having a disability if her employer recognizes her as having an ADA qualifying disability. In order for a perceived disability to qualify, it must be one that, if real, would limit substantially a major life activity of the individual. *Carruthers v. BSA Advertising, Inc.*, 357 F.2d 1213, 1216 (11th Cir. 2004).

Freeland alleges that Southern Nuclear regarded her as

---

[7]This court notes again that the termination claim is outside the scope of this suit. Therefore, her termination is not considered here. The focus of this inquiry is on the events complained of in the original complaint, primarily her referral and treatment in fitness for duty evaluations.

having the disease of alcoholism, which it allegedly thought
substantially limits her in the major life activity of working.[8]
Alcoholism is looked at differently than many other impairments.
An employee suffering from alcoholism can be held to the same
standards for job performance and behavior as other employees are
held, even if it is related to alcoholism. 42 U.S.C. §
12114(c)(4). Alcoholism is not a *per se* disability. *See, e.g.*
*Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1168 (1st Cir.
2002); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316-7 (5th Cir.
1997). Because it is not a *per se* disability, and Freeland does
not in fact claim to be an alcoholic, this court is left to
determine if Southern Nuclear regarded her as substantially
limited in the major life activity of working. An ADA plaintiff
alleging to be "regarded as" having ADA-qualifying alcoholism
must produce evidence showing the employer believed the
alcoholism to substantially limit a major life activity. *Bailey
v. Georgia-Pacific Corp.*, 306 F.3d at 1169-70.

   To be substantially limited in the major life activity of
working, Freeland must be precluded from "more than one type of
job, a specialized job, or a particular job of choice." *Sutton v.
United Airlines, Inc.*, 527 U.S. 471 (1999). "The inability to

---

[8]As was noted in *Carruthers*, it is unclear whether the Supreme Court
will ultimately accept working as a "major life activity" for purposes of the
ADA. Simply put, using work as a major life activity in a statute that acts
primarily to protect against *employment* discrimination creates "conceptual
difficulties." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200
(2002).

perform a single, particular job does not constitute a substantial limitation." *Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004). Freeland argues that being precluded from doing the highly specialized job of nuclear specialist qualifies her as substantially limited. Freeland obviously misunderstands the *Sutton* test. *Sutton* means that being precluded from only a specialized job, or a particular job of choice does not qualify one as substantially limited in the major life activity of working. Without this rule, every person whose particular impairment excluded her from a particular, specialized job, but not from any other, would be entitled to relief. To allow such a narrow claim would make the ADA an all-purpose employment enabling statute, which is far beyond its intended or logical bounds.

Freeland's argument is that her termination, alone, proves that she was substantially limited in the major life activity of work.[9] Her argument misses the point of *Sutton*. In fact, her only claim is that Southern Nuclear perceived that she could not work in the nuclear field. In reality, what Freeland means to say is that she might never able to work with unsupervised access to a nuclear site again. If future employers refuse to hire her because they perceive that she has the disability of alcoholism,

---

[9]Again, this court notes only the argument of Freeland, without taking the termination as part of this claim.

15

then perhaps she will have a claim against those employers. That future employers might regard her as disabled because of actions taken by Southern Nuclear does not prove that Southern Nuclear regarded her as disabled under the ADA.

To survive summmary judgment, Freeland must present evidence that Southern Nuclear "regarded" her as substantially limited from performing a broad range of jobs. *See, e.g. Murphy v. United Parcel Serv. Inc.*, 527 U.S. 516, 524 (1999).[10] Southern Nuclear's perception of Freeland's alcohol problem, if it had one, only called into question her fitness for unsupervised access to nuclear facilities, not her general fitness to work in a broad range of jobs. Merely perceiving her as disabled is not enough. Freeland must provide some basis for finding that Southern Nuclear thought she was precluded from a wide range of jobs. Freeland has failed to produce any evidence that Southern Nuclear regarded her as unable to perform a wide range of jobs.

Referring Freeland to the fitness for duty evaluation and

---

[10]*Carruthers* also stands for a similar proposition. 357 F.2d at 1357. Freeland argues that *Carruthers* is distinguishable because in *Carruthers* "plaintiff failed to prove that her employer had anything more than a general awareness of her initial diagnosis." *Rossbach,* 371 F.3d at 1360. Freeland believes that since she has never been diagnosed as an alcoholic, and there was a general awareness of the diagnosis in *Carruthers*, they must be distinguishable. However, the distinction actually cuts the opposite way. The *Carruthers* standard applies equally when the employer has no *medical reason* to believe the person is disabled. *Rossbach* noted this distinction in the opposite way, to show that the plaintiff has to provide much less evidence that he was "regarded as" disabled when the defendant knows specifically of his actual medical problems. Here, because there was never any diagnosis of Freeland as an alcoholic, Southern Nuclear can have no knowledge of such diagnosis.

barring her from consuming alcohol were actions in accordance
with Southern Nuclear's policies. While no NRC regulation
required Freeland to abstain from alcohol or go to AA meetings,
NRC regulations did require Southern Nuclear to develop a plan
for dealing with fitness for duty issues. The plan it chose
fairly assesses fitness for duty without discriminating against
those with alcoholism. Enforcing strict policies does not
indicate a general feeling that Freeland was unable to work, but
merely that the occurrence of alcohol related incidents presented
questions for which answers were required in order to allow her
unsupervised nuclear site access. Freeland attempts to show that
she was treated unfairly, but forgets to mention how her referral
to fitness for duty evaluations began: she was arrested, and
alcohol was a significant contributing factor in her arrest. She
was not sent to Value Options and made to sign a contract because
her supervisors recognized what they perceived as a drinking
problem and took it upon themselves to solve it, but because she
triggered the policies through her behavior away from work. There
is no evidence from which the court can infer that she was
treated differently than any other employee when she was referred
to Value Options, or in the terms of the contract between
Freeland and Southern Nuclear.

Further, the "direct evidence" that Freeland hopefully
presents does not establish an issue of fact. That Freeland's

17

fellow employees or supervisors said that she had "an alcohol problem," standing alone, does not allow the inference that they regarded her as substantially limited in the life activity of working. More evidence, somehow showing her supervisors or co-workers thought she was unable to work due to her "alcohol problem" is necessary. In fact, Freeland maintained her employment despite the perception of some that she had an "alcohol problem." This indicates that Harris, her supervisor, did not think that her work was called into question. Freeland actually received a raise above the level of many of her co-workers, most of whom are in no way regarded as disabled. There is no evidence that any of her supervisors thought that she was unable to perform her job because of a perceived "alcohol problem." This court is unconvinced that just because supervisors and co-workers attributed some "alcohol problem" to Freeland that they regarded her as substantially limited in the major life activity of working. Clearly, they thought her work was at least acceptable, if not better than it had been before her drinking arrest.

Even if Southern Nuclear regarded Freeland as having some kind of alcoholism and treated her in accordance with that perception, Freeland has failed to show that it regarded her as having an ADA qualifying disability. Southern Nuclear's view was clearly that if she had alcoholism it only affected her at

18

Southern Nuclear because of the sensitive nature of the work. There is no indication that Southern Nuclear found her unsuited for a broad range of jobs, or in fact, any job outside the nuclear field. "A plaintiff claiming that he is regarded as disabled cannot merely show that his employer perceived him as *somehow* disabled; rather, he must prove that the employer regarded him as disabled *within the meaning of the ADA*" *Bailey*, 306 F.3d at 1169. No evidence indicates that Southern Nuclear regarded Freeland as disabled within the meaning of the ADA. Thus, Freeland cannot make out a *prima facie* case of ADA discrimination.

There are any number of other weaknesses in the ADA claim, namely the lack of evidence of pretext. However, because this court finds no perception of a qualifying disability under *Sutton*, judgment as a matter of law is appropriate.

### Conclusion

Southern Nuclear's motion for summary judgment as to each of the two claims will be granted, and Freeland's action will be dismissed by separate order. The motion to strike is essentially moot.

DONE this ____ day of November, 2004.

WILLIAM M. ACKER, JR.

19

UNITED STATES DISTRICT JUDGE

20